17798

W. C. CAMP, Chairman, and Loy Mayfield, Miles Gettys, Claude Hoyle, and Lewis Blanton, constituting Supervisors of Cherokee County Soil Conservation District, Respondents, v. BOARD OF PUBLIC WORKS OF CITY OF GAFFNEY and South Carolina Water Pollution Control Authority, Appellants.

(120 S. E. (2d) 681)

462

*Messrs. Daniel R. McLeod, Attorney General, Julian L. Johnson, Assistant Attorney General,* and *William L. Pope, Assistant Attorney General,* of Columbia, *for Appellant, South Carolina Water Pollution Control Authority,* and *Messrs. Wade S. Weatherford, Jr.,* of Gaffney, and *Sinkler, Gibbs & Simons,* of Charleston, *for Appellant, Board of Public Works of the City of Gaffney,*

*Messrs. Johnson & Smith,* of Spartanburg, *for Respondents,*

June 13, 1961.

OXNER, Justice.

This action was brought in their official capacities by the Supervisors of Cherokee County Soil Conservation District to have declared null and void a permit issued by the South Carolina Water Pollution Control Authority to the Board of Public Works of the City of Gaffney for the enlargement of the sewerage disposal plant on Beaverdam Creek in Cherokee County, and to enjoin the Board of Public Works from proceeding under said permit. Upon the filing of the complaint, the Court below issued a temporary restraining order and directed the Board of Public Works and the Authority to show cause why the temporary injunction should not be continued. Each of the defendants filed a demurrer and also answered and made a return to the rule. Thereafter a hearing was had on the pleadings, certain documentary evidence and data furnished by the Water Pollution Control Authority, after which an order was issued in which the Court held the permit issued to the Board of Public Works was null and void. From this order, both the Board of Public Works and the Authority have appealed.

We have the rather unusual situation of litigation between three public agencies, each of which was created under statutory authority with certain specified powers and duties.

The Cherokee District was organized under the "Soil Conservation Districts Law" which was enacted in 1937. Sections 63-51 to 63-167, inclusive, of the 1952 Code. The underlying purpose of this legislation was to conserve the soil resources of the State and control or prevent soil erosion. General supervision is placed under the State

Soil Conservation Committee. The Act further authorizes the creation of soil conservation districts to be operated under the direction of soil supervisors. The State Committee is required to furnish assistance and information to the supervisors. Briefly stated, the supervisors of the districts are empowered to determine by investigation and research measures needed to control soil erosion and disseminate information thus obtained; to make demonstrations of methods and measures by which soil resources may be conserved; to carry out preventive and control measures on State owned lands within the district or other lands upon obtaining the consent of the owner; to cooperate with and furnish financial assistance to land owners in the carrying on of erosion control; to purchase, improve and sell property in furtherance of the purposes of the Act; to make available to landowners such machinery, fertilizer, seeds, seedlings, and other materials and equipment as will assist them in conserving their soil and preventing erosion; to develop comprehensive plans for the conservation of soil resources and for the control and prevention of soil erosion within the district and bring them to the attention of the landowners; to formulate regulations governing the use of lands within the district in the interest of conserving soil resources and preventing erosion; and "to sue and be sued in the name of the district."

Appellant South Carolina Water Pollution Control Authority was created "within the State Health Department" under the Water Pollution Act of 1950. Sections 70-101 to 70-139, inclusive, of the 1952 Code. It is given jurisdiction "to abate, control and prevent the pollution of the waters of the State." It is declared to be the public policy of the State that reasonable standards of purity of its waters be maintained, consistent with public health, the public enjoyment of such waters, the propagation and protection of fish and wildlife, the operation of existing industries and the future industrial development of the State, "with a reasonable balance of consideration of the public welfare and,

to that end, that the use of reasonable methods to prevent and control pollution of the waters be required." The Authority is empowered to safeguard the waters of the State from pollution; to prepare and develop a general comprehensive program for the abatement of existing pollution and the prevention of new pollution; to regulate the discharge of sewage into any water of the State; to approve plans for the construction of disposal systems; and after proper study and a public hearing upon due notice, to group the designated waters of the State into classes. Such classifications must be in accordance with the best usage to be made of such waters in the interest of the public. Any classification of a stream may from time to time be altered or modified. Under the terms of this Act, a permit from the Authority is necessary for the construction of a disposal system having as its object the discharge of sewage into any of the waters of the State or for a change in or addition to any existing disposal system which would materially alter the method of disposing of sewage and industrial waste.

As required by the Act, all the streams in the State have been classified by the Authority as to quality and purity. The classifications adopted run from Class "AA" to Class "D". The highest classification is "AA", which is water meeting the State Board of Health regulations as suitable for use for domestic and food processing purposes with sterilization as the only treatment required. Class "B" is water suitable for domestic supply after complete treatment in accordance with regulations of the State Board of Health. Class "C" is water suitable for propagation of fish, industrial and agricultural uses and other uses requiring water of lesser quality. No stream has ever been classified as low as "D". A description of the other clasifications is not necessary.

Appellant Board of Public Works of the City of Gaffney is a municipal agency initially created in 1907, 25 St. at L. 808, through whose management and control the City of Gaffney operates its waterworks and sewerage systems.

We had occasion recently to discuss its functions in *Sossamon v. Greater Gaffney Metropolitan Utilities Area,* 236 S. C. 173, 113 S. E. (2d) 534.

For a long number of years the Board of Public Works of the City of Gaffney has discharged sewage and industrial waste into Beaverdam Creek which is a tributary of Thicketty Creek. After a hearing in 1953, the Authority classified both Thicketty Creek and Beaverdam Creek as Class "C". In April, 1959 Beaverdam Creek was reclassified downward from Class "C" to Class "C-a" in order to permit the Board of Public Works to enlarge its disposal plant on Beaverdam Creek. Later during that year application was made to the Authority to reclassify Thicketty Creek upward from Class "C" to Class "A". This application was brought about by a plan of respondents to create an extensive watershed on Thicketty Creek embracing, according to the complaint, "in excess of 70,000 acres of land, some 9,000 to 10,000 acres of which are bottom land, the construction of a 200-acre lake and a 600-acre lake with numerous dams on the tributaries thereof, one of the principal tributaries being the said Beaverdam Creek". It was proposed to use this watershed for irrigation and recreational purposes. At the hearing on this application it apparently was conceded that the classification upward was not necessary for the construction of the watershed, but it was claimed that the use of this polluted water in irrigation would have a "psychological effect" on the market for fruits and vegetables grown on the land and that it was essential that the pollution be reduced to afford proper marketability.

In June, 1960, the Authority concluded that Thicketty Creek should retain its present classification as a Class "C" stream and undertook to deny the application for an upward classification. In August, 1960, the permit challenged in this action was granted by the Authority to the Board of Public Works in order to permit an enlargement of the disposal plant on Beaverdam Creek.

Respondents contend that the reclassification of Beaverdam Creek downward to "C- a" was done without a hearing as required by the rules of the Authority, rendering it void and of no effect; that the permit granted to the Board of Public Works could not have been lawfully issued without such downward classification; that it was improper to grant a permit while there was pending an application to reclassify Thicketty Creek upward; and that in the proceedings relating to the reclassifications, the Authority failed to comply with the regulations regarding the transcribing of testimony and the issuing, filing and service of orders.

In their demurrers, answers and returns appellants timely challenged the legal capacity of respondents to bring this action or to otherwise attack the administrative action of either the Authority or the Board of Public Works. Reserving the question raised as to the standing of respondents to maintain this action, appellants on the merits contended that the pendency of the application for reclassification did not affect the existing classification of Thicketty Creek; that under the then classification of "C" of Thicketty Creek and Class "C-a" of Beaverdam Creek, the permit was properly issued; that a permit may be granted by the Authority on an *ex parte* application; that the City of Gaffney had a vested right which it had long exercised to use Beaverdam Creek for sewage disposal; and that in any event, this action could not be maintained because respondents had not exhausted the administrative remedies provided by the Water Pollution Act.

We do not reach the merits of this appeal, for we have concluded that respondents have no standing to attack the action of the Authority.

The question of the standing of one administrative agency to challenge the determination or action of another administrative agency is a delicate one which has given the courts much concern. See Administrative Law Treatise, Davis, Volume 3, Section 22.15. One of the leading cases is *United*

*States ex rel. Chapman v. The Federal Power Commission,* 4 Cir., 191 F. (2d) 796, 799. There the Secretary of Interior and a cooperative association sought to have reviewed and set aside an order of the Federal Power Commission granting a license to a private power company to construct a dam at Roanoke Rapids, North Carolina. Under a Federal statute a review of an order of the Commission was allowed upon the petition of "any party * * * aggrieved by an order issued by the Commission." 16 U. S. C. A. § 825*l*. The grievance advanced by the Secretary was that if the power dam were built by the Government, he would have the right to sell the electric power produced; and that by the cooperative association was that if the Secretary should sell the power, it would have a preference in the right to purchase same. In holding that neither was an aggrieved party, the Court, after quoting from a statute relating to the disposition of surplus power generated at reservoir projects under the control of the War Department, said:

"It is perfectly clear that this statute confers no right or interest in any power project or its development, or any responsibility with regard thereto, upon the Secretary of the Interior, or upon the cooperatives mentioned; but merely provides how the surplus power developed at government projects shall be disposed of. Whether a project shall be developed by the government or under license by private enterprise is a matter which Congress has committed, not to the Secretary or to cooperatives who may desire to purchase power from him, but to the discretion of the Commission. * * *

"That the United States, representing the people of the country, may have an interest in the construction of a power project does not confer upon the Secretary of the Interior any authority to go into court for its protection. The safeguarding of that interest has been confided to the Power Commission; and before a member of the cabinet may attack the Commission's action before the courts he must be

able to point to some special interest from which he is charged with responsibility that may be adversely affected by the action attacked. The only responsiblity of the Secretary relates to the disposal of surplus power from government projects; and no duty or responsibility with regard thereto can possibly arise until the government has authorized the project and entered upon its construction. Until then he has no more duty or responsibility in this connection than has the Postmaster General. A *fortiori* the cooperative association, whose only possible interest is to purchase power which the Secretary may sell, has no such right, duty or responsibility with respect to the construction of a power project as would give it standing in court to question an order of the Commission."

The holding of the Court of Appeals that the Secretary and the cooperative association had no standing was reversed in *United States ex rel. Chapman v. Federal Power Commission,* 345 U. S. 153, 73 S. Ct. 609, 97 L. Ed. 918, but since the members of the Supreme Court were divided as to the grounds upon which standing should be based, they concluded not to discuss the question, thus the meaning of the case is left uncertain.

We are not called upon in this case to determine whether one State agency may bring an action against another State agency for a declaratory judgment as to their respective powers with reference to any matter in dispute between them. See *Board of Education of the Town of Stamford v. Board of Finance of the Town of Stamford,* 127 Conn. 345, 16 A. (2d) 601. This is not such a case. Respondents are seeking to set aside a permit granted to the Board of Public Works to enlarge its plant on Beaverdam Creek and to enjoin the Board from proceeding under said permit.

Assuming under some circumstances one public agency may attack the action of another, the complaining agency must at least show that it has some special interest from which it is charged with responsibility

that may be adversely affected by the action attacked. This we do not think respondents have done.

We have only recently held that an administrative agency has "only such powers as are conferred, expressly or by reasonably necessary implication, or such as are merely incidental to the powers expressly granted." *Black River Electric Cooperative, Inc., v. Public Service Commission,* 1961, S. C., 120 S. E. (2d) 6, 11. Nowhere in the Soil Conservation Act are respondents given any jurisdiction over pollution of streams or other waters of the State. Their classification and the regulation of the purity and quality of the water have been committed solely to the Authority, a division of the State Health Department. Respondents are concerned only with the conservation of the soil resources of the State and the control and prevention of soil erosion. They are charged with no responsibility with reference to the pollution of streams. The discharge of sewage into Beaverdam Creek does not affect flood control or soil conservation in any manner. So far as the record discloses, the soil conservation district is not a taxpayer and owns no lands which would be affected by the permit granted to the Board of Public Works. It is true that respondents may "sue and be sued in the name of the district" but this has reference to some matter pertaining to their functions.

For lack of standing on the part of respondents to attack the action of the Authority in the classification of Beaverdam Creek or to challenge the validity of the permit granted to the Board of Public Works, the order of the Court below is reversed and the proceedings dismissed.

TAYLOR, C. J., and LEGGE, MOSS and LEWIS, JJ., concur.